Anthony Agnellino and Florence Agnellino, his wife v. Commissioner.
Agnellino v. Commissioner
Docket No. 79726.
United States Tax Court
T.C. Memo 1961-22; 1961 Tax Ct. Memo LEXIS 318; 20 T.C.M. (CCH) 100; T.C.M. (RIA) 61022; January 31, 1961
Vincent J. Jennings, Esq., 60 Park Pl., Newark, N.J., for the petitioners. Arthur Pelikow, Esq, for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax and additions to tax against the petitioners as follows: Additions to Tax
I.R.C., 1939
I.R.C., 1954
Year
Deficiency
Sec. 293(b)
Sec. 291(a)
Sec. 294(d)
Sec. 6654
1953
$53,701.72
$26,850.86
$8,175.11
1954
29,078.31
14,539.16
($112.49)
4,574.28
1955
34,644.81
17,322.41
$29.53
1956
31,357.15
15,678.58
1957
24,301.17
12,150.59
The issues presented are (1) whether the gross receipts from the operation of the petitioners' motel and restaurant during the taxable years were in excess *319 of the amounts reported by them on their income tax returns and (2) whether the deficiency, or a part thereof, for each of the taxable years was due to fraud with intent to evade tax. Other issues raised by the pleadings have been conceded, and adjustments therefor will be reflected in the computations under Rule 50. Findings of Fact Petitioners are husband and wife, and residents of Long Branch, New Jersey. They filed their joint income tax returns for the taxable years involved with the district director of internal revenue at Camden, New Jersey. During the taxable years Anthony Agnellino, hereafter referred to as the petitioner, owned and operated a motel and drive-in restaurant known as Dale's Motel and Drive-in, on Highway 35, in Eatontown, New Jersey. He lived with his wife and two daughters in an apartment on the premises. Construction of the first section of the motel, containing 13 units and the office, was begun in September of 1951 and was completed in 1952. The second section, which contained 14 units and the petitioner's apartment, was opened on June 30, 1953. When a guest entered the motel, the room clerk would request him to sign a registration card, collect *320 the rent in advance and show him to his room. The registration card was supposed to contain the guest's name, address and automobile license number, as well as the date of registration, the number in the party, the room number, the number of days the room was occupied, the rental rate, the tax, and the total amount paid. The room clerk would keep the day's receipts until the following morning, when he would take the money, together with a memorandum showing which rooms had been rented, to the petitioner's apartment. Some of the registration cards for 1957 failed to show either the number of days the particular room had been occupied or the total amount paid, or both. Other cards made out during that year contained mathematical errors. Also, there were cards which did not contain the correct total amount paid. Three such instances in 1956 and 1957 were as follows: Amount
Amount
Paid per
Actually
Guest
Cards
Paid
Herbert Mesnick
$ 94
$192
James Gigantino
111
315
Edward Carden
25
70
For the years 1953 through 1957, the motel rented its bed sheets from the Consolidated Laundry. Some of the sheets were used by the petitioner and his family, by the *321 motel employees, and by petitioner's friends and relatives who stayed at the motel without charge. Also extra sheets were used in the two-bed units were both beds were used, as when the room was occupied by two adults or when the unit was occupied by a family with children. Two sheets per bed per occupancy day were used by guests staying less than a week, hereafter referred to as transient guests, and six sheets per week were used by guests occupying the motel room for one week or longer, hereafter referred to as weekly guests. In January of 1956, a fire in the motel office spread to the linen storage room in the rear and damaged 159 clean sheets. On January 31, the laundry driver picked up the damaged shects and replaced them with clean ones. During the taxable years, there was an average of seven weekly guests at the motel from June 15 through August 31, [1] and an average of eleven weekly guests at all other times, except for the first six months of 1953, when the average was five weekly guests. *322 The rate charged by the motel during the taxable years was $7.10 for each bed per occupancy day on a yearly average. The total number of bed sheets rented by the motel, the total number of sheets used for the various purposes, the bed occupancy days for weekly and transient guests and the total thereof, the rate per bed occupancy day, and the gross receipts of the motel, for the taxable years, were as follows: Sheets
used
Sheets
by
used
Friends
Sheets
by Peti-
and Rela-
Sheets
rented
tioner and
tives of
Sheets used
used by
from
Motel Em-
Peti-
in Two-bed
Balance of
Weekly
Year
Laundry
Ployees
tioner
Units
Sheets
Guests
1953
7,629
584
100
741
6,204
2,328
1954
10,299
1,000
100
1,000
8,199
3,192
1955
11,228
1,000
100
1,000
9,128
3,192
1956
10,221 [1]
1,000
100
1,000
8,121
3,192
1957
9,289
1,000
100
1,000
7,189
3,192
Sheets
used by
Rate per Bed
Transient
Bed Occupancy Days
Occupancy
Gross Re-
Year
Guests
Weekly [2]
Transient [3]
Total
Day
ceipts
1953
3,876
2,716
1,938
4,654
$7.10
$33,043.40
1954
5,007
3,724
2,504
6,228
7.10
44,218.80
1955
5,936
3,724
2,968
6,692
7.10
47,513.20
1956
4,929
3,724
2,465
6,189
7.10
43,941.90
1957
3,997
3,724
1,999
5,723
7.10
40,633.30
*323 On his income tax returns for the taxable years, the petitioner reported the following amounts as gross receipts from the motel: Year
Amount
1953
[1]
1954
$26,200
1955
20,445
1956
[1]
1957
[1]
In 1954, the petitioner constructed a gasoline service station on property adjoining the motel. The service station was leased to the Socony-Vacuum Company at an annual rental of $3,000, for a term of fifteen years, beginning February 1, 1954. In 1951, the petitioner constructed a drive-in restaurant approximately 15 to 20 feet from the motel. The restaurant had one circular counter, with a seating capacity of 16 persons, 12 booths with a seating capacity of 48 persons, and six tables with a seating capacity of 24 persons. The cash register *324 in the restaurant was usually operated by Virginia Angellino, one of petitioner's daughters, subsequent to her graduation from high school in June of 1955. She would ring up the amount of the customer's check on the cash register tape, and put the cash in the register. At 6:00 P.M. on each day, when she finished working, Virginia would take a certain amount of cash from the register, record the amount taken on a slip of paper and bring it to the petitioner or his wife, Florence. The petitioner kept this money in his pocket. When the petitioner closed the restaurant about 2:00 A.M., he would check the total on the cash register tape against the money in the register. He then took the money and the tape to his apartment. The guest checks for the years in question were destroyed. Petitioner maintained a record of what purported to be the gross receipts from the restaurant for 1956 and 1957 by placing over-all amounts in a daily record book for each of those years. The amounts were supposed to have been taken from the register tapes, but no amounts were listed in the daily book for 1957 from January 1 to March 30, and from August 25 until the end of the year. The figures in the daily *325 books were entered by Virginia in a ledger. During the taxable years, the cost of food sold at the restaurant was equal to 42 per cent of the gross receipts in 1953, 45.954 per cent of the gross receipts in 1954, 45.251 per cent of the gross receipts in 1955, 46 per cent of the gross receipts in 1956, and 50 per cent of the gross receipts in 1957. The food purchases, opening and closing inventories, theft losses, personal consumption of food by the petitioner and his family, consumption of food by employees, cost of food sold, and gross receipts from the restaurant during those years were as follows: Opening In-
Closing In-
Food
Year
Purchases
ventory
ventory
Thefts
1953
$59,193.23
$3,027.10
$2,867.50
$5,200
1954
46,524.26
2,867.50
2,125.75
5,200
1955
54,484.69
2,125.75
1,860.20
5,200
1956
47,932.72
1,860.20
1,987.21
5,200
1957
37,501.23
1,987.21
1,745.32
5,200
Consump-
Personal
tion
Consump-
by Em-
Cost of
Gross Re-
Year
tion
ployees
Food Sold
ceipts
1953
$1,800
$1,800
$50,522.83
$120,363.88
1954
1,800
1,800
38,466.01
83,705.38
1955
1,800
1,800
45,950.24
101,544.50
1956
1,800
1,800
39,005.71
84,795.02
1957
1,800
1,800
28,943.12
57,886.24
*326 On his returns for the years 1953 through 1957, the petitioner reported the following amounts as gross income from the restaurant: Year
Amount
1953
[1]
1954
$ 83,705.38
1955
101,544.50
1956
[1]
1957
[1]
There was a cigaret vending machine in the restaurant, on which the petitioner received a royalty of two cents per pack sold, which royalties averaged $13 per month during the years in question. There was also a juke box in the restaurant, from which petitioner derived $500 per year. The receipts from the vending machine and the juke box were not reported by petitioner on his income tax returns. On April 15, 1958, the petitioner leased the restaurant to James Plasteras. The lease, which was drawn in the name of Plasteras' wife, Marguerite Plasteras, provided for a rental of 8 per cent of the gross income for the first two years, 10 per cent for the next three years and 12 per cent for the next five years. The minimum rental was $5,000 per year *327 over the ten-year term. In January of 1959, the petitioner sold the motel and restaurant to Etta Schoenholz for $175,000. Joseph Agnellino, the petitioner's brother, stayed at the motel from the middle of January until June of 1955. During February and March of that year, while the petitioner was ill, Joseph helped in the motel and in the restaurant. There was no understanding about any regular salary, but Joseph was generally paid varying amounts monthly in cash. [2] The amount of $600 was paid to Joseph by the petitioner in consideration for services rendered at the motel and restaurant. The petitioner employed Dominick Bruno, a certified public accountant, to prepare his 1953, 1954 and 1955 tax returns. The 1953 return was prepared from figures submitted by the petitioner, while the 1954 and 1955 returns were prepared on the basis of the daily cash books kept for the drive-in and from canceled checks, check *328 books, bank statements and the payroll record kept by the petitioner. Bruno saw none of the petitioner's records for 1953, but did inspect the ledger for 1954 and 1955. The motel registration cards were not shown to Bruno. He prepared the returns on the basis of the petitioner's assertion as to what the gross income from the motel was. Bruno increased the gross receipts from the restaurant for 1954 from $68,590.87, as indicated by the daily record book, to $83,705.38, as reported on the 1954 return, after analyzing the petitioner's bank deposits for the year. Where the daily cash book did not show receipts for certain days, Bruno would estimate what the receipts were on each such day, basing his estimates on comparable days in other weeks, but he did not obtain information as to the amounts from the petitioner. In July of 1956, Bruno's employment as the petitioner's accountant was terminated. The petitioner's 1956 and 1957 tax returns were prepared by John McCormack, a certified public accountant. McCormack never audited the petitioner's books, did not check invoices or receipts supporting deductible items, did not review check books or canceled checks, and never reconciled the *329 petitioner's bank account. He visited the petitioner's place of business about five or six times a year. The petitioner maintained a checking account with the Central Jersey Bank and Trust Company in Long Branch. His account was charged almost daily because of insufficient funds to meet incoming checks, but he usually made cash deposits to cover his overdrafts. The bank charged his account $400 to $500 a year because of the overdrafts. Petitioner often carried large amounts of cash, and paid the salaries of his employees in cash. In 1956 and 1957, various items of expense as represented to McCormack were not business expenses, but were personal items of petitioner, such as expenses incurred in maintaining a horse and several dogs, in buying clothing for his daughter and silverware for his apartment, and in paying his life insurance premiums. The deficiency, of a part thereof, for each of the taxable years was due to fraud with intent to evade tax. The gross profit percent on restaurant sales of food is 54 percent for each of the taxable years 1953 and 1957. Opinion The first question is whether the gross receipts from the operation of the petitioner's motel and restaurant *330 during the taxable years 1953 through 1957 were in excess of the amounts reported by him on his income tax returns for those years. It is the contention of the petitioner that he ascertained the gross receipts from the motel on the basis of registration cards showing each guest's name, address and automobile license number, the date of registration, the number in the party, the room number, the number of days the room was occupied, the rental rate, the tax, and the total amount paid. Data from the registration cards for 1953, 1954 and 1955 was not produced at the trial, nor were the cards themselves made available for inspection by the revenue agents, the explanation apparently being that they were destroyed in the fire which occurred in January of 1956. With respect to 1956 and 1957, years for which registration cards were available, 68 registration cards were introduced into evidence by the respondent, evidently for the purpose of showing omissions and errors on them. Many of the cards failed to contain the number of days the room was occupied or the total amount paid, or both. Other cards contained mathematical errors, and in three instances the party occupying the room in 1956 *331 and 1957 appeared and testified, establishing that the amounts shown as paid by them were substantial understatements. The cards were the petitioner's only records of the receipts from the motel. In view of the obvious omissions and errors on the registration cards, the revenue agent reconstructed the gross income from the motel on the basis of a statement made by the petitioner at a conference with two representatives of the Internal Revenue Service on February 7, 1957. At the conference, the petitioner stated that the rental units were occupied 60 to 70 per cent of the time during the "off-season" with 10 or 12 weekly guests, and that they were occupied 100 per cent of the time during the "season" with 6 to 8 weekly guests. He also stated that the weekly guests paid $15 to $20 per week during the off-season, and $40 to $55 per week during the season, while transient guests paid $5 per night during the off-season, and $10 to $12 per night during the season. The revenue agent assumed that the season was a period of ten weeks from July 1 through September 15. To reconstruct the gross receipts for the off-season, the agent used a weekly rate of $17.50 for weekly guests, 11 as the *332 number of weekly guests, a daily rate of $6 for transient guests, and 9.6 as the number of transient guests per day. For the season, he used a weekly rate of $45 for weekly guests, 7 as the number of weekly guests, a daily rate $11of for transient guests, and 20 as the number of transient guests per day. From these figures, the agent arrived at $43,569.40 as the gross receipts from the motel for each of the taxable years 1954 through 1957. The method by which he determined the gross receipts for 1953 has not been shown. During the course of the trial the parties entered into various stipulations with respect to the number of bed sheets used by the motel, the number of sheets used per bed per occupancy day for weekly and transient guests, and the rate charged by the motel for each bed per occupancy day. In the absence of records or books of account, our conclusions of fact have been derived from such stipulated figures. The starting point in our computation is the number of sheets rented by the motel from the Consolidated Laundry. It was stipulated that "for the purposes of the motel," 10,299 bed sheets were used in 1954, 11,228 in 1955, 10,380 in 1956 and 9,289 in 1957. Although *333 the phrase "for the purposes of the motel" is ambiguous, counsel for both parties agreed at the trial that it was a reference to the number of sheets rented as indicated by the records of the laundry. We have so interpreted the stipulation. To arrive at the number of sheets rented for 1953, we took the average of the amounts stipulated for the years 1954 through 1957 and made allowance for the fact that only 13 units were in operation prior to June 30, 1953. It was stipulated that for the years 1954 through 1957, 1,000 sheets were used in the petitioner's apartment and the clerk's room, and that an additional 1,000 sheets were used in rooms in which there were two beds. The respondent concedes that the number of income-producing sheets should be reduced by the extra sheets used in the two-bed units. The same figures were employed in our findings of fact for the year 1953, with an allowance for the operation of only 13 units. We have accepted as true testimony that some sheets were used by the petitioner's friends and relatives who stayed at the motel from time to time without charge. No evidence was introduced, however, as to the number of persons concerned, as to the number *334 of days they occupied rooms, or as to the years involved. In the absence of sufficient information to make a more definite finding, we have found that 100 sheets per year were used by the petitioner's friends and relatives. It has been necessary to arrive at some figure, since we accept the testimony that there were friends and relatives who did not pay for their motel rooms. Accordingly, we have concluded that 100 sheets per year is a reasonable allowance. In January of 1956, a fire in the motel office spread to the linen storage room in the rear and damaged 159 clean sheets. A corresponding reduction has been made in the sheets used for productive purposes during 1956 in our computation of gross income for that year. It is stipulated that two sheets per bed per occupancy day were used by transient guests and that six sheets per week were used by weekly guests. To allocate the income-producing sheets between weekly and transient guests, we have used the petitioner's estimate of an average of 11 weekly guests during the off-season and an average of 7 weekly guests during the season. We have treated the period of June 15 to August 31 as the season, since the evidence of record so *335 indicates. The gross receipts for the motel were arrived at by multiplying the total bed occupancy days by $7.10, which was stipulated to be the rate charged by the motel for each bed per occupancy day. The petitioner contends that he ascertained the gross receipts from the restaurant on the basis of the cash register tapes. Several cigar boxes containing some, but not all, of the tapes for 1956 and 1957 were produced at the trial. One of the boxes was marked for identification, and the parties were allowed time to work up data therefrom. Such data was never produced and no offer was thereafter made with respect thereto. The petitioner did introduce what purported to be daily record books for 1956 and 1957, which supposedly contained the daily receipts from the restaurant, at the bottom of each page. Over-all amounts were noted there, without any indication as to what they were to represent, but no notations were made in the book for 1957 from January 1 to March 30, and from August 25 to the end of the year. The daily record books for 1953, 1954 and 1955 were not introduced. Possibly this was because of the fire which occurred in January of 1956. In the absence of evidence to *336 support the amounts reported as gross receipts from the restaurant on the petitioner's returns, it is necessary to reconstruct the gross income. The respondent has determined that the petitioner's gross profit from the restaurant was 66 2/3 per cent of sales, or, stated otherwise, that the cost of food sold was equal to one-third of the gross receipts. The food purchases, opening and closing inventories, theft losses and personal consumption of food by the petitioner's family were stipulated for the years involved. By adding the food purchases and the opening inventories, then subtracting the closing inventories, theft losses, personal consumption and consumption by employees, we have found the cost of food sold. While the petitioner has testified that part of the food purchased was eaten by the restaurant employees and by deliverymen, there is no evidence of record to disclose the amount of food so consumed. Nor does the petitioner suggest a reasonable allowance for such food. Bearing heavily against the petitioner who had the burden of proof, we have found that the cost of food consumed by the employees and deliverymen was not more than $1,800 in each year. Cohan v. Commissioner, 39 F. 2d 540. *337 There is no evidence that the petitioner is entitled to any greater allowance. In 1954 and 1955, the petitioner segregated the restaurant gross receipts from the motel gross receipts on his tax returns. He reported $83,705.38 in 1954, and $101,544.50 in 1955, as his gross receipts from the restaurant. On the basis of cost of food sold in 1954 of $38,466.01 and in 1955 of $45,950.24, a gross profit percentage of 54.046 per cent in 1954 and 54.749 per cent in 1955 is indicated. While it is true that the figure reported for 1954 was increased from that shown by the petitioner's records, his accountant made the increase after analyzing petitioner's bank deposits, and there is no claim by the petitioner that the increase was not justified. Thus, using the gross receipts reported by the petitioner and the cost of food as stipulated by the parties, except for the small allowance for food consumed by employees, the gross profit is shown to have been between 54 and 55 per cent for 1954 and 1955. Accepting these percentages as accurate, we have found that the gross profit during the taxable years ranged from 58 per cent to 50 per cent, depending largely upon the volume of sales made in the *338 restaurant. On the state of this record, purchases, we think, may be regarded as a fair indicia of the volume of business done, and it has been noted that the purchases in 1953 were larger than in any other of the taxable years and that there was a sharp decline in 1954, a rise in 1955, another decline in 1956 and a very sharp drop in 1957. Giving due allowance to the testimony of the expert witnesses called by the petitioner and the respondent and to the testimony of James Plasteras, who leased the restaurant from the petitioner in April of 1958, we have done our best to arrive at reasonable gross profit percentages for the years in question. We have found that the gross profit was 58 per cent in 1953, 54.046 per cent in 1954, 54.749 per cent in 1955, 54 per cent in 1956 and 50 per cent in 1957. During the course of his testimony, the petitioner admitted that during the taxable years he received income from a cigaret vending machine in the amount of $12 to $14 per month, and from a juke box in the amount of $500 per year. Yet these receipts were not reported on his returns. We conclude and hold that petitioner is taxable on additional income for each of the taxable years of $13 *339 per month, or a total of $156 per year, from the vending machine, and of $500 per year from the juke box. The petitioner contends that the work papers of his accountants support his tax returns, and that the respondent acted improperly in reconstructing his income on the basis of his statement to the revenue agents and a gross profit estimate. We can accord little weight to the work papers, however, since they were prepared solely on the basis of information supplied by the petitioner. Dominick Bruno, who prepared the 1953, 1954 and 1955 returns, saw none of the motel registration cards, and had to rely on the petitioner's assertion as to what the gross receipts from the motel were. He arrived at the gross income from the restaurant on the basis of the daily cash books kept by the petitioner. For 1954, Bruno was convinced that petitioner's records did not include all of his income, after analyzing his bank deposits for the year, so that Bruno arbitrarily increased the gross receipts from the restaurant from $68,590.87, as indicated by the daily cash book, to $83,705.38, as reported on the 1954 return. John McCormack, who prepared the 1956 and 1957 returns, never audited the petitioner's *340 books, did not check invoices or receipts supporting deductible items, did not review check books or canceled checks, and never reconciled the petitioner's bank account. Under these circumstances, the work papers are no more persuasive than the tax returns themselves. Nor can we agree with the petitioner's remaining argument that the determination of the respondent is arbitrary, capricious and excessive, so as to remove the presumption of correctness. The concessions made by the respondent prior to trial do not have the effect of altering the presumption of correctness accorded his determination. Fada Gobins, 18 T.C. 1159, affd. per curiam 217 F. 2d 952. We have found that the petitioner paid his brother, Joseph, $600 in consideration for services he rendered at the motel and the restaurant. From time to time, the petitioner may have given Joseph additional amounts of money, but not as a salary. As Joseph testified, "One month he gave me $220, another month he gave me $180. One month he gave me $500 after the holidays because I didn't have no money. * * * Well, no, excuse me. That was when my mother passed away. He gave me $500 when my mother passed away. *341 " There was no understanding about any salary, and the amounts Joseph received varied monthly. He stayed at the motel from the middle of January until June of 1955, and rendered occasional services. In view of the evidence, we have found nothing to persuade us that more than $600 of the amounts which the petitioner paid Joseph was in consideration for his services. The second issue is whether the deficiency, or a part thereof, for each of the taxable years is due to fraud with intent to evade tax. The respondent has the burden of showing fraudulent intent, with clear and convincing evidence, and, in our opinion, he has done so. The inaccuracies on the motel registration cards were the petitioner's responsibility, and he knew that the result was a substantial understatement of gross receipts from the motel. Although a record of the restaurant's gross receipts was supposedly contained in a daily cash book for each of the taxable years, no satisfactory explanation has been offered for the omission of all purported receipts for seven months of 1957. The petitioner's tax returns were prepared by his accountants, neither of whom ever checked the motel registration cards or the cash register *342 tapes. After analyzing the petitioner's bank deposits for 1954, Bruno, one accountant, arbitrarily increased the gross income from the restaurant for that year from $68,590.87 to $83,705.38, without protest from the petitioner. Bruno also had to estimate the restaurant gross receipts on certain days for which the petitioner had no records. Despite the fact that the petitioner admittedly received income from a cigaret vending machine and a juke box, he ignored these items in reporting his income on his tax returns. He does not claim to have been unaware of the receipt of these items, or to have merely overlooked them when he submitted information to his accountants. Various items of expense transmitted to his accountant in 1956 and 1957 were personal expenses, such as the maintenance of a horse and several dogs, clothing for his daughter, silverware for his apartment, and his life insurance premiums. Taking into consideration all of the evidence, we have concluded and hold that the deficiency, or a part thereof, for each of the taxable years, was due to fraud with intent to evade tax. The petitioner offered no evidence with respect to the additions to tax imposed by section 294(d)(1)(A) *343 of the Internal Revenue Code of 1939 and section 6654 of the Internal Revenue Code of 1954. On brief, he has made no contention that the imposition of the additions was not proper. Accordingly, we regard this issue as having been abandoned. Decision will be entered under Rule 50. Footnotes
1. The period from June 15 through August 31 constituted the busy season for the motel, because it was located approximately three miles from the Monmouth Race Track, which was operated annually from June 10 to August 12. The motel was about the same distance from the Jersey Shore.↩
1. This figure has been reduced by the 159 sheets which were damaged in the fire in January of 1956. ↩
2. Computed on the basis of six sheets each seven days. ↩
3. Computed on the basis of two sheets per day.↩
1. The petitioner did not segregate the motel receipts from the restaurant receipts in 1953, 1956 and 1957. He reported a total of $105,073.50 as gross receipts in 1953, $89,023.20 in 1956 and $94,429 in 1957.↩
1. The petitioner did not segregate the restaurant receipts from the motel receipts in 1953, 1956 and 1957. He reported a total of $105,073.50 as gross receipts in 1953, $89,023.20 in 1956 and $94,429 in 1957.↩
2. Joseph testified that "One month he gave me $220, another month he gave me $180. One month he gave me $500 after the holidays because I didn't have no money. * * * Well, no, excuse me. That was when my mother passed away. He gave me $500 when my mother passed away."↩